In re NORTHWEST PLACE, LTD., f/k/a Urban Medical, Ltd., a Georgia Limited Partnership, Debtor.

NORTHWEST PLACE, LTD., Appellant,

v.

Lawrence E. COOPER and Carol Z. Cooper, Appellees.

No. 1:87–CV–1623–CAM.
Bankruptcy No. 85–03874A–ADK.

United States District Court,
N.D. Georgia,
Atlanta Division.

June 24, 1988.

Robert Edward Hicks and John Michael Levengood, Hicks Maloof & Campbell, Atlanta, Ga., for debtor-appellant.

Lowell H. Hughen, Jones Day Reavis & Pogue, James Herrell Rollins, William Lee Rothschild, Wildman Harrold Allen Dixon & Branch, and H. Quigg Fletcher, III, Hunton & Williams, Atlanta, Ga., for appellees.

## ORDER

MOYE, District Judge.

The above-styled action is before this Court on appeal of an order of the Bankruptcy Court for the Northern District of Georgia dismissing the appellant debtor's ("Northwest") petition brought under Chapter 11 of the Bankruptcy Code, for bad faith filing. 73 B.R. 978. For the reasons stated below, the order of the Bankruptcy Court dismissing the appellant's petition is AFFIRMED.

## I. FACTS

The Bankruptcy Court's order of May 28, 1987 dismissing the appellant's petition for reorganization under Chapter 11 of the Bankruptcy Code sets out the undisputed facts of the case substantially as follows:

In 1982, Appellee, Dr. Lawrence E. ("Dr. Cooper") was the sole general partner of Urban Medical Limited [1] which owned the office building in question. Mrs. Cooper was a limited partner of Urban Medical Limited. On May 26, 1982, Dr. Cooper entered into a transaction by which various entities controlled by Sylvia Kaiser including Medoff Corporation, N.V. ("Medoff") Regalo Corporation, N.V. ("Regalo"), and Consulare Corporation, N.V. ("Consulare") [2] invested in Urban Medical, Ltd.

Urban Medical Ltd.'s sole asset was the office building. Dr. Cooper and Medoff became the general partners of the partnership, and Dr. and Mrs. Cooper and Medoff became the limited partners. Prior to this transaction, the Coopers' interest in the building was valued at $2,500,000.00. Medoff paid $500,000.00 for a one-half interest in the partnership, and Regalo invested $2,000,000.00 in the form of a loan to the partnership. In 1983, there was an adjustment of the partnership structure. Dr. Cooper resigned as general partner and was replaced by Consulare, thereby making the partnership's general partners Medoff and Consulare. Dr. and Mrs. Cooper retained a one-half interest in the partnership.

On May 18, 1984, an agreement was entered into whereby the Coopers were to sell their one-half interest in the partnership to the Kaiser entities. On July 16, 1986, the sale closed in escrow. When the Kaiser entities would not go forward with the sale, Dr. Cooper filed a complaint seeking specific performance of the sales agreement and damages in the Superior Court of Fulton County, Georgia, against Urban Medical, Ltd., Medoff, Consulare, Dara Realty, N.V. [3], and Kaiser. On October 29, 1984, a consent order was entered into by the parties and signed by the Superior Court Judge. The Consent Order provides, in part, that "[t]he parties have agreed and this Court finds that [the 1984 Sale documents] ... are valid, binding and enforceable in accordance with their terms." The Superior Court of Fulton County action is still pending.

The structure of the sale is somewhat complicated. The Coopers sold their interest to the partnership and Dara Realty. Dara Realty then transferred its interest to the partnership. Medoff and Consulare re-

---

1. In March of 1985, Urban Medical, Ltd. changed its name to Northwest Place, Ltd.

2. Sylvia Kaiser is a citizen of Liechtenstein and the managing director and attorney-in-fact of Medoff Corporation, N.V. and Regalo Corporation, N.V. She is also the attorney-in-fact of Consulare.

3. Dara Realty, N.V. is a Netherlands Antilles corporation controlled by Kaiser.

mained the general partners of the partnership and Medoff became the sole limited partner. From the sale, Medoff obtained a 96% interest in the partnership and Consulare obtained 4%. The Coopers were paid $423,790.00 in cash and were given a promissory note for $2,641,250.00 which was secured by the building and subordinate to the two security interests of nonaffiliated lenders. The partnership defaulted on the promissory note to the Coopers in July of 1985. On July 20, 1985, the Coopers accelerated the note and demanded full payment plus attorney's fees. On July 26, 1985, the partnership filed for relief under Chapter 11 of the Bankruptcy Code.

Northwest then filed the instant adversary complaint, which consists of eleven counts. In the complaint, Northwest seeks to set aside the transfer agreed to by the debtor in the Superior Court of Fulton County order dated October 29, 1984. Northwest has included in its complaint many theories upon which it asserts the transfer should be set aside. Counts I, II, and V sought to set the transfer aside as a fraudulent conveyance pursuant to 11 U.S.C. § 548. Counts III and IV sought to set the transfer aside as a fraudulent transfer under state law pursuant to O.C. G.A. § 13–5–6, claiming that the transfer was made under duress. In Count VIII, the debtor asserted that, because of the inequitable conduct of the Coopers, their claims should be subordinated pursuant to 11 U.S.C. § 510. Count IX of the complaint sought to set aside the transfer as a preference pursuant to 11 U.S.C. § 547. Count X demanded a judgment for the transferred property or the value thereof pursuant to 11 U.S.C. § 550. Finally, in Count XI, the debtor alleged that Dr. Cooper has violated certain provisions of the Securities and Exchange Act of 1934.

Northwest also filed a plan of reorganization in which it proposed to make no payments to the Coopers. However, in the event the debtor failed to prevail in the adversary proceeding against the Coopers, the debtor stated in its plan that the Coopers' claim, classified as a Class 7 claim, "[would] be paid in the full amount determined by the Court to constitute an Al-lowed Claim on such terms directed by the Court to constitute treatment leaving the such [sic] claim unimpaired within the meaning of the Bankruptcy Code."

In its Disclosure Statement the debtor stated that the cash flow from the operations of the building was sufficient to pay only the current operating expenses and the first and second security interests on the building. The Coopers had received no payments since June of 1985. The Plan provided that a general partner, *in its sole discretion*, might advance cash to make the required payments under the Plan. Thus, in the event the Court decided the adversary complaint in favor of the Coopers, it was unclear whether there would be sufficient funds to service the Coopers' debt. Approval of the debtor's Disclosure Statement and Plan of Reorganization was held in abeyance pending resolution of the adversary proceeding.

In its schedules, the debtor listed the following secured debts: (1) a first security interest in the building held by Kansas City Life in the amount of $887,977.77; (2) a second security interest in the building held by Lincoln State Savings & Loan in the amount of $1,050,000.00; and (3) a disputed third security interest in the building held by the Coopers in the amount of $2,631,-554.00. As stated above, the debtor was making the payments to the first and second secured creditors. The Coopers received no payments.

The debtor also listed the following unsecured creditors: (1) Regalo Corp., N.V. with a balance at the time of the filing of the debtor's bankruptcy petition of $3,248,-750.00; (2) Fine & Block, Attorneys at Law, in the amount of $5,000.00; (3) Georgia Power Co. in the amount of $3,500.00; (4) Joseph Barnes & Assoc. in the amount of $1,900.00; (5) Jim Brooks in the amount of $250.00. The debtor listed the office building and realty, which was its major asset, as having a market value at the time of the filing of the petition of $9,000,000.00.

The Bankruptcy Court dismissed the appellant's petition given the above facts under 11 U.S.C. § 1112(b) on grounds of bad

faith filing. The Bankruptcy Court found that the purpose of the case was not to reorganize within the historical meaning of that word in the context of the Bankruptcy Code. The Court found that the purpose of the petition was to gain use of the provisions of Chapter 11 so as to assert the powers of the trustee as a debtor in possession in order to set aside the security interest of the Coopers. The Bankruptcy Court further found:

(1) that the transfer which was the object of the adversary proceeding affected only the debtor itself and other related entities;

(2) that there were only a few other inconsequential unsecured creditors, and none had voiced any opposition to the Cooper's Motion to Dismiss;

(3) that the whole case was essentially a two-party dispute;

(4) that the debtor was attempting to "escape" from the state court;

(5) and that the debtor had failed to propose an effective plan of reorganization.

In conclusion, the Bankruptcy Court stated that, "It is quite apparent to the Court that the *only* thing the debtor wants to reorganize is its relationship with the Coopers by converting them back to equity holders."

Subsequent to the dismissal of Northwest's bankruptcy petition, Northwest requested that the Bankruptcy Court stay foreclosure on the building pending appeal of the dismissal order. Northwest and the Bankruptcy Court were concerned that if the Coopers were allowed to foreclose on the property prior to appeal, any appeal of the dismissal order would become moot under the rule enunciated in *In re Matos*, 790 F.2d 864 (11th Cir.1986) and *In re Sewanee Land, Coal & Cattle, Inc.*, 735 F.2d 1294 (11th Cir.1984). Accordingly, the Bankruptcy Court entered an order on June 16, 1988 which granted a stay of execution conditioned upon Northwest's posting of a bond. Northwest failed to post the required bond, and the Court entered a new order on July 14, 1988, amending the June 16 order. The July 14 order allowed foreclosure in accordance with the following:

(1) That the Coopers will bid in the property at the foreclosure sale either in their own name or in the name of a controlled entity of the Coopers;

(2) That, if a bidder not related to the parties in this case bids in the property at said foreclosure sale at a higher price, the Coopers will withdraw the property from foreclosure sale;

(3) That, upon the successful bid by the Coopers, or a controlled entity of the Coopers, at such foreclosure sale, title to the property will not thereafter be transferred, while the appeal in this case is pending before the United States District Court, or until ten (10) days after the entry of an order affirming the Bankruptcy Court's order of May 29, 1987, or the Court's further order on notice to all parties in interest (collectively, a "Termination Date"); and

(4) That the Coopers will enter into any stipulation necessary to preserve the appeal, as herein described, from mootness on grounds that the statute of limitations has expired on the Bankruptcy Code § 548 claim or that a foreclosure sale to the Coopers would itself moot the appeal.

Northwest has now appealed the Dismissal order of the Bankruptcy Court to this Court. Upon submission the Court requested that the parties provide further briefing on the issue of mootness of the appeal. The parties have submitted the requested briefs and the Court now considers:

(1) Whether the appeal of the Dismissal Order is now moot due to foreclosure by the Coopers on the appellant's sole significant asset, and

(2) if the appeal is not moot, whether the Bankruptcy Court erred in dismissing the appellant's Chapter 11 petition.

## II. MOOTNESS OF APPEAL

■ The Court finds that this appeal has not been made moot by the foreclosure and sale of the debtor's major asset. This case is clearly distinguishable from *In re Matos, supra,* and *Sewanee Land, Coal & Cattle,*

*Inc., supra.* Both of these cases establish that in the Eleventh Circuit an appeal from an order lifting the automatic stay becomes moot if foreclosure and sale occurs prior to appeal. First, the *Matos* and *Sewanee* cases involve lifting the automatic stay, but this case involves dismissal of the entire bankruptcy action. The significance of this distinction is that those courts could not grant the only relief requested there, namely, to return a property to the debtor's estate. This Court can grant the relief requested here, namely to reinstate the bankruptcy case. Reinstating the bankruptcy case might ultimately lead to a return of the building or a damage award.

Second, this rule of law which makes appeal moot after foreclosure "is premised upon considerations of finality, protection of the integrity of the foreclosure sale process, and the court's inability to rescind the sale and grant relief on appeal even if the purchaser of the property is a party to the appeal...." *Matos,* 790 F.2d at 865–66. These considerations are not offended in this case due to the fact that the Bankruptcy Court allowed foreclosure and sale subject to certain requirements. One requirement was that the Coopers sell the property only to themselves. Another was that they make any other stipulations necessary to prevent mootness of appeal. Presumably, such stipulations could involve returning the property to the debtor's estate. The Court finds the express efforts of the Bankruptcy Court to preserve this appeal from mootness to be effective.

### III. THE REVIEW OF THE BANKRUPTCY COURT'S ORDER OF DISMISSAL

#### A. *The Standard of Review*

■ The Bankruptcy Court's findings of fact set out above will not be set aside unless this Court determines that they are "clearly erroneous." Bankruptcy Rule 8013. The factual findings of the Bankruptcy Court appear to be supported by substantial evidence in the record, and no challenge has been mounted by the appellant which would lead to the conclusion that any of the Bankruptcy Court's factual findings are clearly erroneous. However, a most difficult issue concerning standard of review is raised by the parties with respect to the Bankruptcy Court's conclusion that the petition was filed in bad faith.

The appellant argues that the Bankruptcy Court's conclusion of bad faith filing is a legal conclusion, and is therefore subject to "de novo" review. As support for this proposition, the appellant cites *In re Grieshop,* 63 B.R. 657, 662 (N.D.Ind.1986). In *Grieshop,* the District Court reviewed the standard used to measure good faith by the Bankruptcy Court. The *Grieshop* court found that the Bankruptcy Court had defined lack of good faith too narrowly. Once the District Court in *Grieshop* determined the proper standard for finding bad faith, it found overwhelming indicia of bad faith and reversed the Bankruptcy Court's order denying the appellant's motion to dismiss. The *Grieshop* court does not appear to have given de novo review as to the actual determination of bad faith. Instead the *Grieshop* court reversed the Bankruptcy Court due to use of an incorrect standard of bad faith and what it found to be overwhelming evidence contradicting the Bankruptcy Court's order.

The somewhat scant caselaw on the subject suggests that the Bankruptcy Court's determination of bad faith filing by applying the underlying facts to the proper legal standard should be set aside only upon a finding by this Court of "abuse of discretion." The Court of Appeals for the Fifth Circuit and the Bankruptcy Appellate Panels of the Ninth Circuit have reviewed findings of the Bankruptcy Courts concerning the issue of good faith under the "clearly erroneous" standard. *Matter of Little Creek Development Company,* 779 F.2d 1068, 1073 (5th Cir.1986); *In re Thirtieth Place, Inc.,* 30 B.R. 503, 506 (Bankr., 9th Cir.1983). Furthermore, bad faith filing is a "cause" for dismissal under 11 U.S.C. § 1112(b). *In re Albany Partners, Ltd.,* 749 F.2d 670, 674 (11th Cir.1984). The determination of cause for dismissal under § 1112(b) is subject to judicial discretion under the circumstances of each case. *Id.*

A de novo review of the Bankruptcy Court's finding of cause would, in this Court's estimation, impermissibly encroach upon the discretion granted to that court by Congress in 11 U.S.C. § 1112(b). *See,* H.R.Rep. No. 595, 95th Cong., 1st Sess. 406 (1977), U.S.Code Cong. & Admin.News 1978, pp. 5787, 6362. Finally, lack of good faith is an issue which is pertinent to cases arising under § 362(d) of the Bankruptcy Code, governing relief from the automatic stay, and under 11 U.S.C. § 1112(b), which permits dismissal or conversion of a reorganization case. *Little Creek,* 779 F.2d at 1072; *Grieshop,* 63 B.R. at 662. Both of these provisions allow relief to be granted "for cause," and a decision on "cause" under 11 U.S.C. § 362 may be overturned only upon a showing of *abuse of discretion. Matter of Holtkamp,* 669 F.2d 505, 507 (7th Cir.1982). Therefore, this Court shall make an independent determination as to whether the Bankruptcy Court applied the proper standard when it determined that the appellant filed its petition in bad faith. *See, In the Matter of Gregory Mobile Homes, Inc.,* 347 F.Supp. 528 (M.D. Ga., 1972). If the proper standard was used, this Court will not set aside the Bankruptcy Court's finding of bad faith unless there was an abuse of discretion.

### B. *Proper Standard for Finding Lack of Good Faith*

■ The Eleventh Circuit Court of Appeals has held that, although a finding of a lack of good faith is not among the grounds listed in 11 U.S.C. § 1112(b), it is nonetheless a ground for dismissal of a Chapter 11 case. *Albany Partners,* 749 F.2d at 674. Despite its recognition as a valid reason to lift a stay or dismiss a petition, the concept of "bad faith" has resisted simple definition. In discussing the concept of bad faith, the Eleventh Circuit has stated that:

> In finding a lack of good faith, courts have emphasized an intent to abuse the judicial process and the purposes of the reorganization provisions. Particularly when there is no realistic possibility of an effective reorganization and it is evident that the debtor seeks merely to delay or frustrate the legitimate efforts of secured creditors to enforce their rights, dismissal of the petition for lack of good faith is appropriate. *See In re Eden Associates,* 13 B.R. 578, 583–85 (Bankr.S.D.N.Y.1981); *In re Victory Construction Co., Inc.,* 9 B.R. 549, 555–56, 558, 564–65 (Bankr.C.D.Cal.1981); *In re G–2 Realty Trust,* 6 B.R. 549, 552–54 (Bankr.D.Mass.1980); *In re Dutch Flat Investment Co.,* 6 B.R. 470, 471–72 (Bankr.N.D.Cal.1980); *See also In the Matter of Levinsky,* 23 B.R. 210, 219–20 (Bankr.E.D.N.Y.1982); *In the Matter of Northwest Recreational Activities, Inc.,* 4 B.R. 36, 38–40 (Bankr.N.D.Ga.1980).

*Albany Partners,* 749 F.2d at 674. No specific standard for determining bad faith is set forth by the Eleventh Circuit in *Albany Partners* or elsewhere. Generally, however, findings of bad faith in proceedings based on §§ 362(d) or 1112(b) have been predicated on certain recurring but non-exclusive patterns, and they are based on a conglomerate of factors rather than on any single datum. *Little Creek,* 779 F.2d at 1072.

In reaching a determination of whether a case has been filed in bad faith, courts have considered the following factors:

1. Whether the debtor has few or no unsecured creditors;
2. Whether there has been a previous bankruptcy petition by the debtor or a related entity;
3. Whether the pre-petition conduct of the debtor has been improper;
4. Whether the petition effectively allows the debtor to evade court orders;
5. Whether there are few debts to non-moving creditors;
6. Whether the petition was filed on the eve of foreclosure;
7. Whether the foreclosed property is the sole or major asset of the debtor;
8. Whether the debtor has no ongoing business or employees;
9. Whether there is no possibility of reorganization;
10. Whether the debtor's income is not sufficient to operate;

11. Whether there was no pressure from non-moving creditors;

12. Whether reorganization essentially involves the resolution of a two-party dispute;

13. Whether a corporate debtor was formed and received title to its major assets immediately before the petition; and

14. Whether the debtor filed solely to create the automatic stay.

*Grieshop*, 63 B.R. at 663. At the root of any definition is a debtor's respect for the underlying goals and policies encouraged by bankruptcy law. Bad faith filing of a bankruptcy petition involves using the process in such a way that the underlying policy of securing an orderly and *fair* adjustment of the relationship between debtor and creditors cannot be realized. *Id.*

The dismissal order of the Bankruptcy Court in this case clearly indicates that the bad faith standard used was that articulated above. Therefore, this Court finds that the Bankruptcy Court used the proper standard in determining the existence of bad faith in filing the bankruptcy petition.

C. *Whether the Bankruptcy Court's Finding of Bad Faith Was an Abuse of Discretion*

■ The Bankruptcy Court below premised its finding of bad faith on a conglomerate of the traditional factors upon which courts have found bad faith filing of a bankruptcy petition. The Bankruptcy Court found that the purpose of the petition was to gain use of the provisions of Chapter 11 in order to set aside the security interest of the Coopers. As the appellant points out, this finding standing alone would not be sufficient to support dismissal for bad faith filing. *See, In re W. & L. Associates, Inc.*, 71 B.R. 962, 967 (Bankr.E. D.Pa.1987); *In re Marina Enterprises, Inc.*, 14 B.R. 327 (Bankr.S.D.Fla.1981). However, the Bankruptcy Court based its finding of bad faith on a number of factors constituting the bulk of the list of traditional factors used to support a finding of bad faith filing. The transfer transaction creating the Cooper's security interest affected only the parties and related entities.

There were only a few other inconsequential unsecured creditors, and none had voiced opposition to the Cooper's Motion to Dismiss. The property foreclosed was the major asset of the debtor. The reorganization essentially involved the resolution of a two-party dispute. The Bankruptcy Court stated that it would "not allow a party to a state court litigation to seek refuge within the Bankruptcy laws of the United States in order to undo what it agreed to do in a consent order signed by the state court, particularly when it will only benefit the debtor and related entities." The debtor's proposed plans for reorganization involved only changing of the status, rights, and priorities of the appellees.

Under the circumstances of this case, this Court does not find that the Bankruptcy Court abused its discretion in dismissing the appellant's petition for bad faith filing. In fact, consideration of the facts in this case shows an overwhelming amount of evidence supporting a finding of bad faith filing. Accordingly, the order of the Bankruptcy Court dismissing the appellant's petition is AFFIRMED.

The clerk of the Court is directed to close this case.

SO ORDERED.